Good morning, uh, counsel. I want to explain that, uh, as you see, there are just the two of us here this morning. Uh, Justice Connacht, uh, can't be with us this morning because of court-related activities that came up at the last minute. Uh, but he will be part of this panel, I want to assure you of that. And, uh, he will be listening to this oral argument and be a participant, uh, in the ultimate, uh, disposition. However, for the purpose of the oral argument today, uh, we just, uh, Justice Holder and I will be part of the panel. But with that explanation, and that doesn't look a little odd, but I want to assure you that it will be handled in due course. So, first case up this morning is 414-0171, Marriage of O'Neill. Show for the appellant, Michelle Blackburn, you know she's there? Yes. Matthew Cate. Ms. Blackburn, who do you represent? Thank you, Your Honor. May it please the court. Counsel. Counsel. Uh, as indicated, my name is Michelle Blackburn. I represent the appellant, Corey O'Neill, in the case that is before this court today on three issues, all related to, uh, financial issues, uh, for the minor children. Uh, the issues before this court are whether or not the trial court erred in deviating downward in setting Mr. O'Neill's child support obligation, whether the trial court erred in denying Ms. O'Neill's request that Mr. O'Neill pay one half of the child care and extracurricular expenses for the minor children, and whether the trial court erred in denying Ms. O'Neill's request that Mr. O'Neill pay one half of the health, dental, and vision insurance costs for the minor children. Uh, important in this case, uh, Your Honors, and so I would like, uh, for the court to indulge me in a brief statement of the facts that are applicable here, because, of course, this is a very fact-driven appeal. Uh, these parties were divorced October 23rd, 2009, uh, by agreement. Neither party had counsel. They prepared their own documents, submitted them to the court. Uh, they had joint custody at that point in time. Uh, primary custody was granted by agreement, of course, to my client. Uh, two minor children who are, at the time of this trial, were 13 and 8. Uh, Mr. O'Neill, by agreement, had, um, a very typical visitation schedule. It was, uh, two nights per week, or two nights per weekend, and one additional night. He agreed to pay $600 a month in child support, which was statutory child support at that point in time, based on a gross income of roughly $38,500, according to a financial affidavit that he completed just prior to that dissolution being finalized. I didn't stop you, counsel, at the question. So you're saying that initially, when they were divorced, the child support was set at the statutory amount? There was not a deviation originally? That's correct, Your Honor. Okay. And at that time, my client had a gross income of roughly $35,000, and again, she completed an affidavit that reflected that. Uh, in that original judgment, she agreed to provide the medical, dental, and vision insurance for the minor children, and the parties were going to equally divide all the uncovered medical bills. The judgment was silent as to the issues of child care, extracurricular, and school-related expenses, but the parties from the time of the divorce forward had historically, um, divided those expenses relatively equally. In January of 2013, after Mr. O'Neill, um, had a job with the Illinois Department of Corrections, which was not his employer at the time of the divorce, um, my client filed a motion. It was his employer at the time of the divorce? I believe it was Brinks, which he then stayed on as a part-time job after he went to DOC. Okay. Go ahead. Uh, in January of 2013, uh, Ms. O'Neill filed a motion to modify child support, and in Mr. O'Neill's response that he filed in February of 2013, he asked the court for relief, including setting the child support obligation consistent with the statutory guidelines, ordering the parties to equally divide the costs of summer camp and other extracurricular activities for the minor children. That was Mr. O'Neill's request. Ms. O'Neill's request was, of course, to set the child support a statutory amount, equally divide the uncovered, or excuse me, equally divide the extracurricular expenses and the child care expenses, and for Mr. O'Neill to pay 50% of the cost of the health insurance that she was, health, dental, and vision insurance that she was providing. If I, unless I misunderstood you, you just said Mr. O'Neill was seeking the same allotment of statutory child support? That's correct. So they were in agreement with that? They were in agreement as to the statutory amount. The reason that we initially went to trial, there were other motions pending, but the reason we went to trial on that particular issue was there was a disagreement between the two of them about whether or not his overtime at the Department of Corrections got included. So the question is not whether she set the statutory sum, but what his overall income was? That was what the issue was that was presented to the court. Then in closing argument, we did written closing arguments for the court, and in those closing arguments was the first time that Mr. O'Neill had requested a deviation downward from the guideline amount of child support, and I believe he had requested that it be set at like $208, and statutory, depending upon whose calculation you take, was roughly, I think the court determined by averaging that it was $800 and not $794, I think. So at the hearing that went forward on these issues, there was testimony about Mr. O'Neill's employment at the Department of Corrections, as well as his on-call basis employment with Brinks. There was also testimony that he received overtime income from the Illinois Department of Corrections. It was testified that his base salary was $45,800 per year, with the Department of Corrections, and then overtime in addition to that. So clearly there was the change of circumstances because in 2009 his income was roughly $35,000. Through the pay period ending October 15, 2013, which was the pay period just prior to us going to trial, Mr. O'Neill already had a gross income from the Department of Corrections of $44,837, with five pay periods left to be paid in 2013. So he was within $1,000 of his base salary already at that point in time. So Ms. O'Neill, or I on behalf of Ms. O'Neill, basically annualized the income that he had made year-to-date, both at Brinks and the Department of Corrections, in determining what the child support calculation should be. And in closing argument, proposed a child support calculation of $880 a month to be the statutory amount of child support. The court, when the court issued its ruling in this case, took the position that what she wanted to do in figuring out what statutory child support was, was to average our proposed child support calculation and Mr. O'Neill's proposed child support calculation. That was an error from the beginning because Mr. O'Neill's child support calculation did not take into account him receiving any overtime pay at all from the Department of Corrections, which the evidence was that he clearly had received, I believe, about $8,500. What was the argument you presented to the child support and why it shouldn't be considered? I don't believe that there was an argument. My recollection of their closing argument was they said, this is his income, his base salary is $45,800, another $1,000 from Brinks, this is what child support should be set at. And counsel, isn't it also accurate that they represented that there had been some additional hires at DOC, as well as the fact that he had changed shifts, or was about to change shifts, and they were asserting that that would impact his overtime? They did present a letter from his employer that indicated that there were, I believe, 22 new hires, but there was no indication in that letter or any testimony that that was going to affect the overtime. With regard to the shift change, they did present evidence that his shift had changed and you get $0.80 more an hour, I think it was, on the shift that he had been on. But I believe I even calculated that, even considering the fact that there was a difference of about $0.80, we were talking about a very small difference in income for the purposes of calculating child support. Certainly not $8,500 in difference, which, if I recall correctly, Mr. O'Neill's testimony himself was any income that was reflecting on his pay above and beyond his base salary was overtime salary. I believe he acknowledged that through October of 2013. Now, this case was a little difficult, frankly, to try and figure out and put on evidence about what his current income was because Mr. O'Neill had not completed a concurrent financial affidavit. It was seven months old at the time, so he had only calculated his income on that financial affidavit as of April of 2013. And frankly, when I questioned that, he had no explanation for why he had not updated his financial affidavit, except for to say to me that in order to figure, if he had completed one up to date, that he basically would have done the same sort of calculation in coming up with his gross income as he had done in April. So there was no formal request to have him file an up-to-date affidavit, but basically he conceded your calculation was correct? That's correct. That's correct. And while there was no request to do that, there is a rule in this district that, or in Sagamon County at the very least, that he has to update it 14 days prior to trial, and he had not done that. So he did not comply with the law? In my opinion, yes, he did. Was this pointed out to the trial court? It was pointed out to the trial court. The trial court inquired as to why it had not been done, and the answer, if I recall correctly, the answer from his attorney was that it just had not been updated. Now, your honors, as far as expenses, and since we're talking about this affidavit of income, one of the interesting things about this case is that the court's position was that the deviation should be granted because clearly Mr. O'Neill cannot afford his expenses on a salary of $54,000 plus a year and pay statutory child support. Did the court also seem to heavily rely on what I would consider a small differential between what the parties earned? Absolutely, they did. As a matter of fact, in the court's order, what the court said was that my client would receive a windfall if the child support were set at the statutory amount based upon the fact that she, I believe the court had calculated, she would have an income of $70,000 in 2013, and the court was relying upon my client's income with her overtime included, which is what our calculation had shown, where the court was relying upon Mr. O'Neill's without his overtime included. So basically, he got an $8,500 give me, if you will, because the court determined that my client was going to be making substantially more and there was no guarantee of Mr. O'Neill's overtime employment. Mr. O'Neill lives with his parents, lived with his parents. Since the party separated, correct? Since the party separated. Mr. O'Neill had lived with his parents and used that as a reason why his child support should be less than the statutory amount. There was no evidence presented by him that he had tried to find alternate living arrangements, that he had tried to purchase a home, tried to go out and rent somewhere and realized he couldn't afford it. I mean, he literally had just lived with his parents for four years. There was also no rent. He pays no rent to his parents. He pays no utilities to his parents. He has none of those expenses. He has minimal expenses for the children, including he was paying $50 a month, according to his affidavit, for the children's traveling soccer team, $20 a month for some lessons and supplies, $100 a month for summer camp. But this court, this trial court, basically relieved him of all of those obligations. So he no longer has $170 worth of obligations unless he just voluntarily wants to contribute. But is it fair to say the trial court relieved him of those obligations when he didn't necessarily have them to start with? And when they had an agreed judgment and they seemed to be able to agree on, you know, I know the summer camp was now an issue, but they seemed to be able to agree on what the kids should participate in and they split that. And so given the standard of review is abuse of discretion, I think you've got a tough sell there. Well, I agree with the court. He was never under an order to actually do those things. I was coming at that argument more from the position of, on his affidavit of income, he listed all of those as expenses of his, which if the court is trying to determine whether or not he can support himself, he no longer is required to pay any of those. Okay. In addition to those expenses that he was voluntarily contributing to, he also testified at some length about the money that he has per month in order to take these children on vacation. $2,400 a year he has available to himself to take these children on vacation, and that didn't include the 2013 vacation, which he was more than happy to tell me, cost over $3,000 because he had taken the children to Florida. And, Your Honors, one other thing that I think needs to be said about the visitation schedule is, if the court will recall, he made a request, Mr. O'Neill made a request for four additional visitation periods for the purpose of taking these children to professional sporting events. Well, I have been to my fair share of professional sporting events, and I know how absolutely incredibly expensive a venture like that can be. So it seems very disingenuous to me for Mr. O'Neill to come before the court and ask to pay $208 a month in child support, but ask that he be able to take these children to professional sporting events and pay the cost associated with that. That is a request that was granted by the court. The court granted him the opportunity to actually be able to do that in the future. What is the child support order at the moment? Child support order at the moment is $550 a month. You mentioned it's $280. Is that what he asked to be reduced to? That's correct. And he had been paying $600? That's correct. By agreement? Yes. So the court not only deviated, but deviated well below the guideline, in my opinion, and below what was ordered of him in 2009 by agreement. The child support came up with a written order, didn't it? It did, yes. A lengthy one. Did you file a motion to reconsider or question what the child support had done? Your Honor, my client determined that she did not want to go the route of a motion to reconsider. I presented that to her, but she felt like she wasn't going to get any relief from the trial court because that was clear from the court's order, and so it was just one more step that she was going to have to pay for probably to just end up here anyway. Thank you. Your Honors, with regard to the affidavits of income, my client's, which was prepared just prior to the hearing in 2013, and Mr. O'Neill's, which was prepared, of course, substantially earlier than that, it is clear that my client does not have the wherewithal or the income to meet her expenses each month without the contribution of child support in the amount of the $880, which is what we proposed as statutory child support, 28% of Mr. O'Neill's income. My client, living what I would consider to be a fairly nominal standard of living, has expenses of $3,812 a month, including over $250 a month in children's expenses, and frankly she gave substantial testimony about the vacations that she takes because she only had $15 a month in vacations, and of course I questioned that, and she said, we don't take vacations unless we can go somewhere where we can stay with family or friends so that we don't have that expense because I don't have that extra money to spend on What is your direct employment? Vacation. My clients. She works for the Department of Human Services, the state of Illinois. And she maintains a residence for her children? She does. She pays for the rent and utilities and all the things that go with maintaining the household? That's correct. That's correct. And she provides, well as you indicated, she provides for all of those expenses for the children with the exception of the child support that Mr. O'Neill contributes to her. She is fully responsible for the house, a car payment, all of the expenses that are associated with maintaining a house, feeding the children, all of that kind of stuff. With regard to the findings that the court made in this case, the court made a number of findings that are frankly just inaccurate. The court made a finding that how it arrived at the child support calculation, the court found that it was appropriate to just say, without considering the actual evidence, the court said, okay, here's your number, 880, here's their number, and frankly, off the top of my head, I can't remember what their number was. I'm just going to average the two and that's what I'm going to use as a statutory amount. That's not the court's job. What the court's job is to evaluate the evidence and figure out what his income is, even if the number is different than my number or Mr. O'Neill's number. The requirement is you've got to figure out what his child support or his income is for the purposes of calculating child support, not just average two numbers that have been presented to you by the attorneys. The court also said- As for what you're saying, there was no dispute that your number was accurate if you consider everything that he was making that the statute allowed you to consider in calculation. That is accurate. My number was based upon the evidence that was presented to the court with regard to overtime-based salary and the Brink's income. The difference was the overtime salary that his did not include? That's correct, about $8,500 gross in overtime salary. Again, what was the argument on why it shouldn't be included? Because it might not be present in the future? Well, that's the only argument that I can believe was being made, although there was no testimony to support that argument other than, like I said, this letter that came from his employer that said, we've hired 22 new employees and his base salary is $3,818 a month. But other than that, there was no evidence that those 22 new hires were at all going to affect his overtime that he was receiving. Where was his place of employment with DOC? Jacksonville Correctional Center. The court also made a finding that my client was likely to receive overtime in the future, which of course was not supported by the testimony that was presented to the court. Your time is up, Counsel. You have a chance to address this again. Thank you. Mr. Cate. Thank you. May it please the Court. Counsel. Counsel. Again, I'm Matthew Cate, and I'm here on behalf of Christopher O'Neill on this matter. Again, obviously we disputed a number of things, but first let me just address why we're here. It's because Ms. O'Neill is just unhappy that she brought a case to begin with. What this case was really about was her motion to modify the joint custody situation down to a sole custody situation. The trial court heard witnesses, heard evidence, weighed that evidence, weighed the credibility of that evidence, and made a ruling that denied that request. Along with that, there was a motion to increase the child support. The reason I'm bringing that up is because that's simply what we have going on here, weighing evidence and the credibility that goes with that, and they're making a determination based upon that. That's what the trial court does. So there will be determination with respect to his pay? Absolutely, Judge. Overtime. He testified that all the additional employees that hired, that there would not be necessarily overtime for him in the future. In Jacksonville Correctional Center, there was a huge issue, a huge public issue, of overtime pay that was getting paid out to these prison guards. Was this evidence presented to the trial court? Absolutely. How many hires they had and the fact that he testified. You're talking about this big problem in Jacksonville with overtime. I'm saying the underlying reason the additional employees were hired. But regardless, no. And so additional employees were hired for whatever reason they were hired, but it was to alleviate, obviously. Well, specifically the question is, what was the evidence before the trial court that the overtime pay would not continue? All the additional employees that were hired, and our client stating that he did not believe he would have the additional overtime. Well, that may be a testimony in good faith, but if you've earned X dollars in the last year, and your testimony is, it looks like I may not earn X dollars as an overtime pay, shouldn't the court, in determining how much child support to order, base its order on what's happened and what we know for sure, such that, for instance, in the event that overtime ceases, to say something to Mr. O'Neill like, come back here if that's the case, and I will adjust the order accordingly, but until that's the case, I'm going to base this order on what's happened. I agree that could have happened, but Judge, what you could also do is the exact opposite of that. Ms. O'Neill is always available to file a motion to reconsider the child support also. This particular ruling was over a year ago. We haven't done that. She had the ability, even as this part was under repeal, she still could have done a motion to reconsider, saying, hey, he's getting overtime. It's been over a year ago. That hasn't happened. But counsel, the statute is very clear. It's a simple calculation. I agree. And so, why would we exclude the overtime, which is something that should be considered in that calculation, child support is to make? I would simply say, Your Honor, it could be considered. It could be considered. It's based on speculation. Overtime and bonuses would always be based on speculation. What would we be receiving in the future? Our calculation was based on the base pay, which he was supposed to be receiving, based on his new shift, and the testimony in regard to the additional employees who were hired, and his own testimony as to that. My point simply being, it's a credibility issue. You cannot be speculative enough to say that you're automatically going to have the overtime in the future. Justice Steinman, in your honor's court, you could come back. You could tell him, hey, you should come back later and do it. The trial court could do the same thing to Ms. Hemingway and say, oh, part of the order could have been such that we'll look at a review at the end of the year, much like you can do on bonuses, and say we'll do a calculation based on that if he does receive the overtime. The trial court here made the determination that she did not believe he would be getting overtime in the future. It did not base it upon that. That's within trial court's discretion to do so, and it's not an abuse of discretion to do otherwise, your honor. If Ms. O'Neill has the opportunity, gosh, I would argue every day of the week that that's unrealistic, three months down the road, six months down the road, and say, too bad, no, he's getting overtime, files the motion to modify, and does so. And in fact could have done so here, although we're sitting a year later and that has not happened. Well, counsel, in this situation, she came in with a calculation showing basically your client had earned only $1,000 short of his pay and through the overtime, and that evidence was less credible than your client's testimony that there are 22 more people and I probably won't get overtime anymore? Absolutely. Your honor, in fact, the employee, the only person who testified as to that was the employee as to those issues. Absolutely. Could Ms. O'Neill have called other witnesses or called the employer and said, hey, are you really going to do this? Are they really going to not get the overtime anymore? Could have done that. Didn't do that. So we're left with Mr. O'Neill saying that, and yes, credibility comes down to that. This is combined with your client not volunteering this information to the court, by the way, by complying with the local rule to outline his income within 14 days of the trial. I understood the financial affidavit should have been updated. I would simply state that as a practical matter, it shouldn't happen. The hearings go forward all the time when those affidavits have not been updated. The response to that is, is the normal course that parties do not have to proceed, it would have been at our client's cost to then update that financial affidavit. It would not have counted against counsel, and by proceeding, I would argue that counsel waived any argument as to that issue. That happens all the time when financial affidavits are not updated, and definitely the court could have admonished and required this not to go forward. So, by proceeding, I would simply argue that anything in regard to that has been waived, but going back to our closing argument does provide an accurate calculation based on Mr. O'Neill's pay information, and also factors in an averaging of the brink's income, which was a smaller income, but averages that out also. So it does, I would argue that a closing argument and the calculations provided in it do provide an accurate calculation of that. So, without the overtime bill. Right. Absolutely, without the overtime, and that's, Your Honor is, again, I know that Your Honor is concerned about that in that sense, but the trial court can take in that evidence and determine that the person is not going to have overtime in the future, or not going to have a bonus in the future based on that evidence. The alternate would be to have someone else call the trial to testify that says, heck no, he's going to get overtime all the time. That didn't happen here. And, she's not without relief. She could absolutely go right back to the court and say, no, he's getting overtime. I suppose one of the problems, though, is the question of who should this person be, and that trial courts, and, you know, Justice Olbermann and I have been in that position. Absolutely. When you're evaluating the evidence, I think it should be retrospective. That is, what's been earned is the justification of earning in the future, and to the extent that the party says, I'm going to be earning less, it seems to me that there should be a burden upon that party to demonstrate how and why. I don't even think we have a good hearsay. That is, this has widened the mark, Mr. Cain. I've had Mr. O'Neill said, my supervisor told me last week, because we have these new employees, we're not going to have overtime available for me anymore. That would be hearsay, but something was worthwhile if we're an objective. We don't even have that. As I understand the record, the only thing we have is his belief, based upon his understanding of the situation at DOC, because new people have been hired, that there will be less overtime for him. That's supposed to trump the retrospective assessment of what the parties have earned? It seems like a stretch. It may possibly be a stretch, Your Honor, but I would simply say that it's simply a credibility issue for the trial court to decide. The trial court believed him. I understand that we're troubled by that. I understand that you can say that it's speculative. Well, our questions are finding it back when dealing with the math that's related to the evidence. I understand. And how is that consistent with the math that's related to the evidence? His belief that maybe this is going to happen, and therefore that trumps the act of what he's earned to this point. Well, it's the only evidence that's put on in that regard, as to that, in terms of him making those statements. I understand, Your Honor, it's troubling by the, this is a hearsay issue or something of that nature. Not that good. If it were a hearsay, then it's a question of unobjected hearsay. Can it be given its due weight? We don't even have that. What we're engaging in right now is just that speculative nature of what is weighing of that evidence. I don't understand how it's speculative when we have the evidence, what he had made up until that point. How is that speculation? Speculation as to whether or not he's going to receive overtime in the future, Your Honor. That's the speculation. Any time we have that issue with overtime or bonuses, we're always dealing with that. And it's speculative nature. Well, we set a time for looking at what the party's situation is at that time. And certainly if there's some credible evidence that comes in, you know, that says, well, I've been fired or I'm not going to have this job much longer or things of that nature, but we just have a self-serving state. Well, nobody new persons have been hired. I won't be receiving overtime. I don't think I will. I probably won't. That's what we have. Okay. I understand, Your Honor. I understand Your Honor's troubled by that. But that is how we would base whether or not we're going to receive overtime or not. And a lot of that is going to be based on opinion. I definitely agree with that. I understand. I do understand that. I mean, that's what trial courts do every day. They make a call on whether or not this is going to be income received or not received. Am I going to get a bonus this year? No. Yes or no? That's a credibility issue. It really is. And I think the matter is, yes, up to that point, here's what he had earned. The big question becomes, okay, we know that under the statute it's a simple calculation. We don't even have a situation here where the court said, okay, doing this calculation as directed by statute, this is the amount I come up with, but I'm going to deviate from that. No. We have the court averaging this figure you presented, your client presented, you on your client's behalf, that is completely inaccurate as far as being representative up to that point with this accurate amount. It's not an accurate amount either, Judge. Actually, counsel is basing it on the old shift, the old shift. I understand you're saying that's a slight modification, but my point simply being is that wasn't an accurate either. Has he started the new shift? Absolutely. I mean, it's not evidence before this court that can state that, yes, and I think counsel would acknowledge that. Was that before the trial court that he had started the new shift? Yes. There was evidence from him and from those presented that he would have the new shift. He then had started the new shift, and I don't think counsel denied that's happened. By the way, when did the evidence about his belief that he didn't think he would have more overtime because of new hires, when did that come out? At the end? I mean, I believe that was testified to about new hires. So he was on the witness stand and he testified to this? Testimony of hires. Okay, and that's when he expressed his belief that his overtime would be reduced? Correct. Going back to your argument about waiver, up until that point, why wouldn't our counsel for Ms. O'Neill have reasonably believed that there was no significant change and that there was no need to raise the issue that there had been no update of the affidavit of assets liabilities because it seems to me the presumption would be had there been a significant change like, by the way, it would be $9,000 short of income next year. That's something that would have been forthcoming before Mr. O'Neill was on the witness stand and testified. Sure, and in every case you make a decision, it's your discovery. Ms. O'Neill could have taken his deposition. Well, doesn't that undercut your argument that she waived any objection by proceeding? I don't believe so, Judge. How would she know that there was anything to object to? She could have taken his deposition and talked about that. Is that standard for cases of this kind? You have to take depositions before you go to a hearing on a motion to modify child support or whatever? It wasn't just that. Okay, motions will change constantly. I do, but I'm not saying every time. Absolutely not. For people like this, we're not talking about the cardiologist over at Memorial Hospital. I understand there's always a financial burden, but that's the choice. That's the choices we make in terms of what discovery is presented and what discovery is done. So why should she be able to depend upon the fact? You know, we have this rule that says if there's a change in the financial circumstances, it should be notified. Now, you say, well, it's people ignored. But it seems to me practitioners might ignore it in the expectation that there's been nothing significant or no difference. I want to keep in mind, Your Honor, that wouldn't have shown anything likely through that point. The point is it was in the future that it would have the change. So there's nothing in that financial affidavit. So this is all just blindsided from the witness that, oh, by the way, you know, I'm going to have $9,000 less? Absolutely. Just because, remember, in this case, they have all the pay information and whatnot. So there's not, on the pay side of it, there's not a big surprise. So there wouldn't be anything new. The only otherwise warranted would have been a deposition. Absolutely right. Do you always do depositions in cases when you have limited budgets? No, you don't. But there wouldn't have been anything else to do. The first time that information would come up would be at hearing. Well, that's a troubling prospect. How about just, especially if you have a hearing coming up, and this is what the testimony is going to be, affirmatively telling the other side, by the way, you know, my client's going to have $9,000 less. We want you to understand it as well. You could create a new rule to that regard, I would say. That's a new rule? Well, a new rule that, here's a new issue we'll be raising at trial, is that he's not going to earn overtime in the future. There's nothing in it to say, hey, this is something we have to tell the other side. That wouldn't be new. Counsel, you hadn't even, your client hadn't even disclosed the overtime. So it wasn't a matter of we're not going to get this overtime in the future. We're not going to mention the overtime. I'm sticking with my old affidavit. I'm failing to comply with the rule, and had you not leapt into what he was making on this website, you wouldn't even know that he had this overtime. It seems like you're going to allow the person who's not complying with the rule to benefit. That doesn't seem fair. Okay, two things on that. Again, the financial affidavit would not have changed anything in terms of the argument as to whether or not he was going to receive overtime in the future. That doesn't help the fact that there wasn't, at the time of the hearing, there wasn't a dispute as to what he had earned through that date. He acknowledged that. That was received. That wouldn't have changed any course. What the court turned on was, am I going to receive that in the future? So a compliance or noncompliance financial affidavit would not have changed one iota in terms of the argument in regard to overtime. It wouldn't have. There's nothing that would have shown up on that, an updated financial affidavit, that would say, in the future, I'm not going to receive the overtime. The one alternative would be Justice Eichmann's idea that we would alert the other side that at hearing, we're going to present this testimony, and this is what we're going to present. We're not required to do that, though, in any case, to say, hey, this is the reason we believe that we're going to deviate. And the court, by the way, very quickly, because we've gotten very much into overtime, the court does a good analysis of deviation. Actually, as Justice Eichmann told me approximately two years ago, the trial court is not required to give a point-by-point analysis of each point saying why they're doing something or not doing something on the deviation argument. In this one, we have a 16-page order, much of which she spends on the financials, and much of which she spends then later on why deviation. Your Honor, I believe it was appropriate to deviate in this matter. It was appropriate to deviate in this matter because one of the reasons, yes, he doesn't have a house. Absolutely. Isn't that a choice, counsel? I mean, he's lived in this house for four years. He obviously makes enough money to live long enough. I don't know if that's obvious or not, but a choice based on financials I think the court can bring that in. When you're looking at all the information, you can bring that in. I don't think it's anyone's choice as an adult male or female person to be living back at home with their parents after a divorce. I think that's a stretch to say that that would be someone, especially when they're testifying, that they would like a house if they could afford it. I would agree with you. If the person said, yeah, I love living at home. It's great. I'll back up my parents. They're in their 60s. Well, he's not in their 40s. But if he doesn't have the funds to do so, Your Honor, that's somewhat going around the bend on it. And that's not the appropriate, I'm sorry, but that's not the appropriate function of the appellate court to re-weigh the factors that are being applied if the trial court did an appropriate job going through the factors. That's my question. Didn't the trial court basically say, because he can't afford to live on his own, then I'm going to deviate so that hopefully he'll be able to live on his own, and plus, the mother agrees that it would be good if he lived on his own. Wasn't that in the order? I think that was a portion of what was in the order, yes, as far as her analysis of going through those factors. I mean, I don't know what else you would have the trial court do, in a sense, when it believes that that's the case. It's looking at the households. It's looking at the parties. It's looking at the standard that the parties had during the time. And also, and we're going to take a quick pause. We've said before that the parties have nearly equal incomes. No, that's undisputed. She's at over $70,000 in income. Once you work in the $12,000 raise, current income, and some of the child support that previously went out before this was done, as compared to what's agreed upon is less than 50. She's getting about 50% more income than he is. That's not nearly equal. I mean, that's simply not the case. I thought the evidence was that she made about $11,000 more than he does with her overtime. And, of course, we don't know what his overtime would equal out to. But isn't that accurate? I don't believe that is when you add in also you add in something for the child support that would go into her household. So you could have either the $550,000 or the previous amount of the $600,000. You end up at over $70,000 in income, Your Honor. And I think that is accurate. At best, Your Honors, I think the alternative should go back to the trial court to review that analysis to do some of the things that I believe you're suggesting to do to have that evidence and have that done. What could easily be done is determine whether or not he did receive the overtime. The fact that Ms. O'Neill did not go back to the trial court, did not get a motion to modify a few months in is surprising because she had the option to do that, but hasn't done that. And as far as the, again, I just would like to touch on, and very quickly just because I didn't get to them if I might just have two seconds more, but the extracurricular activities, that's discretionary for the court. It's absolutely discretionary pursuant to the statute. The amounts spent on that are still the amounts that are going to be spent by him, so there's no windfall to him by not having extracurriculars. The medical, which we didn't even touch on, you can actually review the previous order between the parties. It actually already deals with that issue as to the medical insurance and confirms that Corey O'Neill was responsible for that. Okay, your time is up.  Ms. Blackburn? Thank you, Your Honor. Ms. Blackburn? Yes, sir. Thank you. So, Your Honor, first I think it's important because there has been some confusion here on exactly what Mr. O'Neill testified to. Mr. O'Neill did not testify that he would have no overtime. This was an exact quote of his testimony. His overtime would, quote, probably go down. Not that he wasn't going to have any, not that he had any estimation as to what it was going to look like. Just simply, it would probably go down. Did his testimony provide any further explanation for that assessment? That was in response to my question about how these 22 new employees were going to affect his income. So, other than that, no. That was his answer to that question. Well, I guess he testified on direct examination in some fashion about overtime. What do you say to that? If you're cross-examining on it. I'm cross-examining him on the letter. I think the letter was presented. I, of course, objected to it because it was hearsay inexplicably to me. For some reason that objection got overruled and it came in to evidence. The letter saying what? Saying that there were going to be, his base salary was $3,818 a month and that there were going to be 22 new employees that either had recently been hired or were going to be hired. And the letter said nothing about overtime. That's correct. It said nothing about overtime. Your Honors, I was a little surprised by the statement from Mr. Cate that my client should have to come in and file a motion to modify child support every time that she believes that he is again getting overtime or that he's had an increase in his salary. I can tell you based upon 13 years of experience in family court that if I file a motion to modify on behalf of a client of mine that says so-and-so is getting overtime 75 to 80 percent of the time by the time we get to hearing either there all of a sudden is no overtime or it's anticipated that there is going to be no overtime. So yeah, I suppose my client could file a motion to modify every six months, every year because she of course can see his income online all the time and I can bet you every time by the time we get to court there's all of a sudden going to be no overtime income not anticipated any overtime income in the future and that's what we're going to be stuck with. That is exactly why when courts are determining child support and determining what income is it is a retrospective analysis because any other thing is absolutely completely speculative. I would suggest to the court that the better way that the court could have handled this is that they could have set child support at the statutory amount and if for some reason Mr. O'Neill did not get the overtime that we had presented to the court that we thought he was going to get, he could have filed a motion to modify and come back into court saying here's the numbers, here's the evidence I didn't get the overtime that they said I was going to get, please reduce my child support. That would have been the more appropriate way to handle this in my opinion. With regard to the burden for the deviation, the burden for the deviation is not my client's burden. So when Mr. O'Neill wants to come in and say he's not getting overtime it's his burden to bring his employer in to say he's not going to be getting any overtime. Counsel, isn't there a presumption that child support at the statutory amount is the correct amount? Absolutely, that is absolutely the law and the case law actually says unless there's some sort of compelling reason to justify a deviation, deviations don't get granted. I don't consider it a compelling reason that Mr. O'Neill wants to live with his parents and have very few if any expenses and he wants to do extracurricular hobbies and events with his children. Those were the two reasons this court decided a deviation was appropriate. Because he goes with his parents and because if we don't give him a deviation he won't have any money to do all these extra hobbies and fun things with his children. So with regard to your claim that the trial court erred in denying the client's request on one of the extracurricular activities and child care expenses, you don't cite any case law? Are any cases on point? What's the story with that? Well, Your Honor, I had difficulty frankly finding cases that were on point as to that issue and I realize that is a discretion thing for the court. My bigger issue with that was first you deviate, then you say he has to pay half of anything, and then on top of that you say, oh and by the way, even though the statute says he has to pay 50% of the health insurance, excuse me, that I'm not even going to order him to do that either. And here's what I'm going to do for you instead. I'm going to give you both dependencies and exemptions every other year. And that should compensate for everything that I just took away from you. Your Honor, just real quick with the issue of this health insurance issue. I believe the statute's mandatory. The way I read the statute, the way I read Seitzinger, the statute is mandatory. He should be paying half of his health insurance obligation upon a request from my client. My client's made that request and the court denied that request. Okay, thank you. Thank you. And so, thanks for my little advice and congratulations. Thank you, Judge.